**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

| | |
|---|---|
| **JACKIE ROBINSON,** | |
| Plaintiff, | |
| v. | Civil Action No. 7:13-CV-92 (HL) |
| **COLQUITT EMC, DIXIE LIGHTFOOT, and DOUG LOFTIS**, | |
| Defendants. | |

## ORDER

Plaintiff Jackie Robinson, an African-American man, brings this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII"), and under the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("§ 1981") asserts that Defendants Colquitt EMC, Dixie Lightfoot, and Doug Loftis discriminated against him on the basis of his race. Plaintiff alleges that Defendants impermissibly targeted him for discipline based on his race alone and treated him differently than other similarly situated Caucasian employees. Plaintiff also claims that Defendants permitted racially derogatory conduct to permeate the employment landscape, creating a hostile work environment and subjecting Plaintiff to the intentional infliction of emotional distress. Now before the Court is Defendants' Motion for Summary Judgment. (Doc. 54). After reviewing the pleadings, briefs, depositions, and other evidentiary materials presented, and

determining that there is no genuine dispute of the material facts, the Court finds that Defendants are entitled to judgment as a matter of law and grants Defendants' motion.

## I.    FACTUAL BACKGROUND

Plaintiff Jackie Robinson ("Plaintiff") worked for Defendant Colquitt EMC ("Defendant") from January 16, 2002 until his termination on July 2, 2012. Defendant maintains a progressive discipline policy and terminated Plaintiff following a documented series of disciplinary actions for substandard work, inappropriate conduct, safety issues, carelessness, and failure to respond timely when on call. Plaintiff contends that Defendant applied its disciplinary procedures unevenly, holding him and other African-American employees to a different standard of conduct than their Caucasian counterparts. Plaintiff further asserts that Defendant permitted certain racially-motivated behaviors to pervade the workplace, creating a hostile work environment for Plaintiff. The facts viewed in the light most favorable to Plaintiff are as follows.[1]

### A.    Plaintiff's Disciplinary History and Termination

Defendant is a not-for profit consumer-owned electrical distribution system that provides energy to members in Berrian, Brooks, Colquitt, Lowndes, Tift and

---

[1] The facts set forth herein, unless otherwise noted, are derived from those portions of Defendants' Statement of Material Facts (Doc. 56) admitted by Plaintiff. (Doc. 71).

Worth Counties. The company is headquartered in Moultrie and operates district offices in Valdosta and Tifton and branch offices in Adel, Nashville, and Quitman. Plaintiff began working as a Groundman out of Defendant's Valdosta office on January 16, 2002. Plaintiff worked without incident for the first seven years of his career with Defendant, receiving regular positive performance evaluations accompanied by corresponding raises in pay. Plaintiff gradually moved from Groundman to Lineman Apprentice to Lineman, and finally was promoted to Senior Lineman in April 2009.

Plaintiff received his first written warning in October 2009. Disciplinary action resulted from a September 17, 2009, incident during which Plaintiff failed to follow proper procedures for installing a mechanical jumper while splicing wire. This mistake caused a 20-minute power outage. Defendant placed the written warning in Plaintiff's personnel file. The company took no other disciplinary action against Plaintiff in relation to this event.

Plaintiff was not disciplined again until March 17, 2011, when he received a written warning along with a four day suspension without pay resulting from his failure to secure properly a hot phase while working in the bucket of a truck on March 14, 2011.[2] Defendant temporarily reassigned Plaintiff from the Valdosta

---

[2] Plaintiff's personnel file contains an incident report dated February 8, 2011, when Plaintiff dug up a telephone line while operating a trencher. Plaintiff was not

3

office to the Moultrie office following this episode and warned him that a future incident would result in disciplinary action, including days off without pay, reassignment, demotion, or termination. Plaintiff's crew leader, Ray Parish, who is Caucasian, also received a four day suspension for failing to notify management about the incident.

Two months later, on May 3, 2011, Plaintiff was involved in a work-related car accident. Plaintiff was driving Defendant's truck #30 when the boom knuckle of his truck hit the rear of truck #2103, driven by Leslie Hunt. Neither Plaintiff nor Hunt reported the accident to their employer. Plaintiff provided inconsistent statements about the cause of the accident. He admits that he possibly made a statement to his crew supervisor that the damage to the truck resulted from hitting a transformer. He also admits that he might have reported that he bumped another truck while driving to the job site. Plaintiff later confessed to his dishonesty and to violating company policy regarding failure to report the accident and lying to cover up the property damage. Consequently, on May 5, 2011, Plaintiff received a written warning and a five day suspension. Additionally, Defendant demoted him from Senior Lineman to Lineman. Plaintiff's co-worker, Leslie Hunt, a Caucasian male, was suspended but for a shorter period of time

---

officially written up for this occurrence, and there is no evidence that he was penalized in any way.

because he had no recent prior incident and because Defendant determined that Plaintiff was at fault for the accident and initiated the cover-up.

Plaintiff next was written up for tardiness on September 15, 2011.[3] Plaintiff forgot to set his alarm on September 14, 2011, and, as a result, was late to work. Shortly thereafter, Defendant transferred Plaintiff back to the Valdosta office.

The next disciplinary event occurred on October 18, 2011, when Plaintiff failed to secure a neutral line while working in the bucket of a truck. The line fell down the pole and sprang back up, creating the potential for serious injury both to Plaintiff and others on the job site. As a result, on October 27, 2011, Defendant issued Plaintiff another written warning and suspended him for four days. Defendant further cautioned Plaintiff that the "next incident of sub-standard work, conduct, safety, disobedience, or carelessness will result in immediate termination." (Doc. 62, p. 68).

Following the October 2011 incident, Plaintiff met with Doug Loftis, Manager for Human Resources and Corporate Services for Defendant; Dixie Lightfoot, District Manager in Defendant's Valdosta office; Sidney Zipperer, Operations Manager; and Ronnie Caldwell, District Operations Superintendent for the Valdosta office. Management reviewed Plaintiff's recent rash of conduct

---

[3] Plaintiff was involved in another episode on July 14, 2011, when he allowed an energized URD elbow to touch a transformer. He was counseled, but there otherwise was no disciplinary action taken against Plaintiff.

resulting in disciplinary measures. Loftis inquired why Plaintiff was having difficulty performing his job. Plaintiff responded that the recent death of his sister was on his mind and creating a distraction. At the conclusion of the meeting, Loftis instructed Plaintiff that he would have to be an "exemplary Lineman" for the next several years.

Plaintiff worked without incident from October 2011 until May 2012.[4] Then, on May 8, 2012, Plaintiff received a three day suspension for failing to respond timely to a power outage on May 6, 2012.[5] Plaintiff was on call on that date. When the dispatcher notified him about the outage, Plaintiff informed her that he

---

[4] On April 16, 2012, Plaintiff was counseled but not disciplined after failing to close a switch on a new piece of equipment with which he was not familiar.

[5] Defendant maintains a policy requiring prompt response when an employee is on call. The appropriate response time and whether or not there is a written or merely an understood policy is unclear from the record. Doug Loftis testified in his deposition that a late response is not responding to the dispatcher within 30 minutes. (Doc. 63, p. 46). The policy sets the expectation that the on-call employee will respond to the dispatcher's call within 30 minutes, not necessarily arrive at the job site within that time period. (Id. at 60). However, after 30 minutes, the individual is considered late. (Id. at 61). Dixie Lightfoot testified that the company expects a response within 15 minutes of receiving a call from dispatch. (Doc. 64, p. 29). Justin Brown and John Fisher likewise testified that employees are supposed to respond to dispatch within 15 minutes. (Doc. 65, p. 29; Doc. 67, p. 46-47). Ray Parrish testified that he understood the policy to be that an on call person is to respond to the dispatcher's call within 15 minutes and report to the site of the outage within 30 minutes. (Doc. 66, p. 38). Plaintiff testified during the course of his deposition that after 10 years of employment, he was familiar with Defendant's on-call procedures, but he never stated what he believed to be the appropriate response time. (Doc. 59, p. 64).

was at a family reunion planning meeting.[6] Upon further investigation, management determined that after placing the first call to Plaintiff, the dispatcher called again 45 minutes later, at which time Plaintiff said that he would respond in ten minutes.

Plaintiff met with Loftis, Lightfoot, and Caldwell on May 11, 2012. Management reviewed Plaintiff's disciplinary history and provided him with a memorandum explaining that he was at the "last chance" stage of Defendant's progressive discipline policy. Plaintiff was told that he was at the point of termination in every aspect of job performance, including substandard work, inappropriate conduct, safety issues, attendance problems, disobedience, and carelessness. Management emphasized that another incident of any sort would result in immediate termination. Loftis again told Plaintiff that he needed to be an exemplary employee in order to keep his job.

On June 30, 2012, Plaintiff again failed to respond to a call in a timely fashion. Plaintiff testified that on that date he had become overheated while

---

[6] Plaintiff did eventually respond to the call. In his response to Defendants' Statement of Facts, however, Plaintiff denies the amount of time he took to respond. (Doc. 71, p. 7). Plaintiff submits that he told the dispatcher that it would take him 30 minutes to get home, change, and get back on the road to respond to the call. (Id.). Plaintiff's responses and deposition testimony contradict the written statement he provided to his employer shortly after the incident in which he stated that at 4:00 p.m. he was at home. (Doc. 62, p. 77). When the dispatcher called, he said that he needed 30 minutes because he was in a meeting. At 5:05 p.m., the dispatcher called again. (Id.). Plaintiff "[w]as in the truck and rolling with[in] 5 mins." (Id.).

cutting grass. (Doc. 59, p. 215). When the dispatcher called at 4:02 p.m., he informed the dispatcher that he was ill. (Id.) The dispatcher inquired whether he still could make the call, and Plaintiff replied in the affirmative. (Id.). He then fell back asleep. (Id.) Plaintiff recollects that the dispatcher called again at 4:45 p.m. (Doc. 59, p. 214). He then completed the call at 5:48 p.m., and returned home by 6:19 p.m. (Id.). In contrast, the dispatcher's log shows that the first dispatcher contacted Plaintiff at 4:02 p.m. (Doc. 82, p. 14, 16). A second dispatcher called at 5:48 p.m. (Id.). Plaintiff completed the call at 6:19 p.m. and returned home at 6:39 p.m. (Id.).

As a result of this final incident, Defendant terminated Plaintiff on July 2, 2012. Dixie Lightfoot signed the Separation Notice, but Danny Nichols, the General Manager, and Doug Loftis made the ultimate decision to relieve Plaintiff of his position. Defendant listed Plaintiff's position on July 5, 2012, and promoted Chris Bolling, a Caucasian male and existing employee, to fill the vacancy on August 16, 2012.

### B.    Plaintiff's Hostile Work Environment Claims

Plaintiff alleges that despite Defendant's policy prohibiting discriminatory and harassing conduct, during his tenure working for Defendant he was subject to a barrage of racially discriminatory and offensive conduct from other

employees that created a hostile work environment.[7] Plaintiff stated that when he first began working for Defendant, he heard someone say that Plaintiff would not make it as a Colquitt EMC employee. Early in his employment Plaintiff indicated that each February Andy Sykes would ask "What do Black people need Black History Month for?" or "What is Black History Month for?" After Barak Obama's election as President, Justin Brown, a Caucasian foreman, stated, "The Black people now got them a Black Jesus."

In 2004 or 2005, Herman Brasher, a non-supervisory employee of Defendant, told another Caucasian employee that "if the base closes, this will be nothing but a nigger town." Plaintiff was present when Brasher made the comment. Brasher later apologized to Plaintiff. From 2006 through 2007, Plaintiff worked under the supervision of a foreman by the name of Monty Cowart. Cowart regularly referred to Plaintiff as "colored" or "colored boy." Plaintiff at some point during this time frame verbally addressed Cowart's treatment to Lightfoot and Loftis. Following this conversation, the comments ceased. Cowart no longer supervised Plaintiff and eventually was relieved of his position as a foreman on September 16, 2007.

---

[7] Defendant's Employee Handbook, which Plaintiff acknowledges receiving, contains a provision on "Harassment/Discrimination" and instructs any employee who feels he has been subjected to any type of harassment or discrimination to report the incident immediately. Defendant also maintains an Anti-Harassment Policy, which again encourages affected employees to report unacceptable conduct. Plaintiff was aware of this policy.

Justin Brown confessed to Plaintiff in 2009 or 2010 that he and Ray Parrish, another Caucasian foreman, burned a cross at Lowndes County High School more than 20 years ago. Plaintiff never raised this conversation with management, and he, Brown, and Parrish never spoke about the matter again.

Plaintiff complains of other intermittent comments made by other employees. He states that Brown regularly addressed him as "hey" or "you" rather than by his name, even though he referred to Caucasian employees by their given names. Parrish made comments along the lines of "What's the matter with you butterfingers?" or "Butterfingers, you can't keep your mind on what you're doing," when Plaintiff would drop something while working in gloves. Plaintiff never instituted any complaint about these remarks and admits that the particular terminology employed by Brown and Parrish was not racially offensive.

Plaintiff heard other co-workers make what he perceived as racially charged declarations. Ronnie Caldwell once said, "I don't trust Nancy Pelosi and the clown that's running this county." Reid Ensley passed around his cell phone to share a picture of President Obama boarding Air Force One carrying a watermelon under his arm. David Sills upon pulling up to a work site once declared, "How in the world are we supposed to get in all this nigger S right here." Sills also joked with Plaintiff that "Pontiac stands for poor niggers think it's a Cadillac."

It is not clear from the record when Plaintiff's co-workers made any of these isolated statements. However, Plaintiff admits that he never complained to anyone in management about the pictures or comments made by other employees either directly to him or in his presence.

### C.   Plaintiff's EEOC Charge of Discrimination

Plaintiff completed and submitted an Intake Questionnaire to the Equal Employment Opportunity Commission ("EEOC") on July 19, 2012. Plaintiff alleged that his July 2, 2012 termination was discriminatory. He stated that his crew leader, Justin Brown, discriminated against him by calling him "hey" or "you" but referring to other Caucasian employees by name. (Doc. 62, p. 83). Plaintiff further alleged that "[n]o one else [was] ever terminated for response time to service calls." (Id.). Along with his questionnaire, Plaintiff provided a cover letter dated July 18, 2012, in which he detailed numerous other allegations of discrimination and disparate treatment. (Doc. 62, pp. 86-145).

Plaintiff filed a formal Charge of Discrimination on October 12, 2012. (Doc. 62, p. 90). In response to the inquiry regarding the basis of his discrimination claims, Plaintiff marked the box for "Race." (Id.). Plaintiff provided the following details about the basis of his race discrimination claim:

> I.    I was hired by the above employer on January 16, 2012, as a Groundman. My last position held was Lineman. On July 2, 2012, I was discharged.

11

II.   I was told by Dixie Lightfoot (White), District Manager that I was discharged due to my slow response time to service call.

III.   I believe that I have been discriminated against because of my race (African American) in violation of Title VII of the Civil Rights Acts of 1964, as amended.

(Doc. 62, p. 90).

On March 18, 2013, the EEOC wrote to Plaintiff to inform him that Defendant responded to his claims and denied any allegations of race discrimination. (Doc. 62, pp. 91-93). The letter outlined Plaintiff's disciplinary history and provided him with the opportunity to respond. On March 27, 2013, Plaintiff provided the EEOC with additional information concerning his view of the events leading to his termination. (Doc. 62, pp. 94-96). He explained, "I filed my discrimination suit because of unethical treatment of black employees. Whites have had the same or similar incidents not used to pad their file[s] for termination." (Doc. 62, p. 95).

The EEOC issued Plaintiff a Dismissal and Notice of Rights on April 18, 2013. (Doc. 62, p. 97). Plaintiff initiated this lawsuit on July 2, 2013, raising claims under Title VII and § 1981, for race discrimination, disparate treatment, disparate impact, and retaliation.[8] Plaintiff further alleges that Defendants

---

[8] Plaintiff abandoned his claims for disparate treatment and retaliation. (Doc. 72, p. 1). Those claims are, accordingly, dismissed.

subjected him to a hostile work environment and that he is the victim of Defendants' intentional infliction of emotional distress.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and … the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A genuine issue of material fact arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When considering a motion for summary judgment, the court must evaluate all of the evidence, together with any logical inferences, in the light most favorable to the nonmoving party. Id. at 254-55. The court may not, however, make credibility determinations or weigh the evidence. Id. at 255; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of a material fact." Celotex,

477 U.S. at 323 (internal quotation omitted). If the movant meets this burden, the burden shifts to the party opposing summary judgment to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact, or that the movant is not entitled to judgment as a matter of law. Id. at 324-26. This evidence must consist of more than conclusory allegations. See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). In sum, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

## III.   DISCUSSION

Plaintiff alleges that Defendants discriminated against him on the basis of his race in violation of Title VII and § 1981.[9] These statutes both "have the same requirements of proof and use the same analytical framework." Standard v. A.B.E.I. Servs., 161 F.3d 1318, 1330 (11th Cir. 1998). Accordingly, the Court will address Plaintiff's Title VII claims with the understanding that the analysis also applies to the § 1981 claims.

---

[9] As pointed out by Defendants and unrefuted by Plaintiff, "a Title VII claim may be brought against only the *employer* and not against an individual employee." Dearth v. Collins, 441 F.3d 931, 933 (11th Cir. 2006) (emphasis in original). Therefore, Defendants Lightfoot and Lofitis are entitled to summary judgment as to Plaintiff's Title VII claims.

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may establish a prima facie case of discrimination through either direct or circumstantial evidence. Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1085 (11th Cir. 2004). Claims of race discrimination premised on circumstantial evidence, as is the present case, are evaluated under the burden-shifting framework developed in McDonnell Douglas Corp. v. Green. 93 411 U.S. 792 (1973). In order to make out a prima facie case under this framework, the plaintiff first must set forth "facts adequate to permit an inference of discrimination." Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997). If the plaintiff is able to do so, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981). The employer "need not persuade the court that it was actually motivated by the proffered reasons." Id. at 254-55. "If the employer satisfies its burden of articulating one or more reasons, then the presumption of discrimination is rebutted, and the burden of production shifts to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination." Wilson, 376 F.3d at 1087.

15

### A.    Prima Facie Case

To establish a prima face case of discriminatory discharge, Plaintiff must produce circumstantial evidence that "(1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was treated less favorably than a similarly situated individual outside his protected class or was replaced by a person outside of his protected class." Thompson v. Tyson Foods, Inc., 939 F. Supp. 2d 1356, 1364 (M.D. Ga. 2013) (citing Maynard v. Bd. of Regents, 342 F.3d 1281, 1289 (11th Cir. 2003)). The parties here do not dispute that Plaintiff meets the first three criteria, nor do they contest that Plaintiff was replaced by a Caucasian individual. However, Plaintiff cannot establish a prima facie case of disparate treatment because he fails to point to a similarly situated comparator who was treated more favorably.

To draw a valid comparison, the plaintiff must demonstrate that he and the comparators "are similarly situated in all relevant aspects." Holifield, 115 F.3d at 1562. In the context of disciplinary action, "the quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999). "[I]t is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." Holified, 115 F.3d

16

at 1562; see also Rioux v. City of Atlanta, Ga., 520 F.3d 1269, 1281 (11th Cir. 2008) ("The most important factors in a comparator analysis in the disciplinary context are the nature of the offenses committed and the nature of the punishment imposed.").

Plaintiff's conclusory statement that he was treated differently from similarly situated Caucasian employees and that no other employee for Defendants was ever terminated based on failure to respond timely to a call is not sufficient to prove his prima facie case. In support of his contention, Plaintiff states simply that to his knowledge Trent Lasseter, Brent Roe, and Justin Brown all failed to respond to service calls yet were not terminated. Plaintiff cites to no evidence in the record to support this statement. Nor has Plaintiff produced any evidence to show that any of these other employees were similarly situated in terms of the remainder of their disciplinary histories.

Plaintiff also summarily states that Defendants treated him differently from other similarly situated Caucasian employees by not forwarding his incident reports to the safety committee for review and, generally, that other employees were disciplined more leniently. Again, Plaintiff provides no factual basis for this belief. Rather he summarizes that his claims are fact intensive and should proceed to a trier of fact without offering a foundation for the essential facts in dispute. (Doc. 72, p. 7).

Pointing to John Fisher and Ray Parrish[10] as comparators, Plaintiff claims that Defendants disciplined him more severely and deviated from the progressive discipline policy to the benefit of Caucasian employees. On March 14, 2011, there was an incident where Plaintiff failed to secure a hot phase while working in the bucket of a truck. (Doc. 62, p. 56). As a result, the phase fell, "hitting a guy wire and opening a downline OCR." (Id.). Defendants charged Plaintiff with a "Substandard Work" violation, suspended him for four days, and temporarily reassigned him from Valdosta to Moultrie to evaluate and determine Plaintiff's "ability to retain current position as a Senior Lineman." (Id.). In the course of meeting with management subsequent to this event, Plaintiff admitted, "I made a mistake and I'll take my punishment." (Id. at 57). Plaintiff now alleges that he was following the direction of Parrish when this incident occurred, and complains that Parrish's punishment was not as severe.

However, the record reflects that Parrish likewise received a four day suspension without pay for failing to notify his supervisors about the hot phase incident and was told that Defendant was evaluating whether Parrish had the ability to maintain his position as a crew foreman. (Doc. 82, p. 24). Defendants

---

[10] Fisher and Parrish are both Foremen and have supervisory authority over the line crews. However, as Foremen, they have no hiring or firing capabilities. Their role is to give direction at the work site and to report any incidents that might occur on the job. (Doc. 66, pp. 13-14, 36. Doc. 67, pp. 15). Defendants make no argument that Fisher and Parrish are not appropriate comparators based on their status as Foremen who supervised Plaintiff.

further warned Parrish that a similar incident would result in days off without pay, reassignment, demotion, or termination. (Id.). Concerned about Parrish's ability to supervise a line crew effectively, Defendant determined that management needed to monitor Parrish more closely and began making regular field checks to document Parrish's leadership capabilities. (Doc. 66, pp. 56-57). While Plaintiff argues with Defendants' reasons for instituting disciplinary measures against Parrish as a result of this incident, namely that Parrish was reproached for failing to report the incident rather than his alleged role in the incident, ultimately, the two received comparable reprisals.

In support of his argument that Defendants unevenly managed the progressive discipline policy, Plaintiff highlights Fisher's disciplinary history. According to Plaintiff, Fisher received a written warning in August 2011 for unacceptable behavior, noting that in the event of future infractions, Fisher would be subject to four days suspension without pay, demotion, or termination. Despite two subsequent incidents, Defendants permitted Fisher to keep his job. The August 2011 warning resulted from Fisher's failure to supervise adequately a Lineman who was doing "Hot Work." (Doc. 67, p. 71). The event resulted in a write-up being placed in Fisher's file and three days suspension without pay. Defendants further informed Fisher that the next incident of substandard work would result in four days off without pay and demotion or termination. (Id.).

19

Fisher's next written warning occurred on May 29, 2012, and stemmed from his failure to inform his supervisor of his intent to take annual leave. (Doc. 67, p. 74). He received one day off without pay and was warned that a subsequent infraction of that nature would result in four days off without pay or termination. (Id.). Then, in April 2013, Fisher was written up again for backing into another vehicle at a railroad crossing. (Doc. 67, p. 75). Defendants considered this event a minor incident and took no action against Fisher beyond placing a written warning in his personnel file that would be active for 18 months. (Id.).

First, the Court notes that Fisher is not a viable comparator because his disciplinary history shares neither the volume nor severity of Plaintiff's employment record. Second, the record contains no evidence that Defendants strayed from the progressive discipline structure when addressing Fisher's conduct. As explained by Doug Loftis in his Supplemental Declaration, the "next incident" language that appears in each of the written warnings refers to "the next incident of that type." (Doc. 82, p. 5). Thus, had Fisher had another infraction involving his failure to supervise his crew following the August 2011 incident, then the increased disciplinary measures referenced in that particular warning would have applied. However, his next two violations were wholly unrelated and, thus, required different disciplinary measures.

20

Reviewing Plaintiff's written admonishments, the Court concludes that Defendants applied a similar progressive standard to each of Plaintiff's infractions. For example, Plaintiff's September 17, 2009 write-up for failure to follow proper work procedure by not installing a mechanical jumper while splicing wire, which Defendants categorized as "Substandard Work" and "Carelessness," resulted in a written warning and an admonishment that the next incident would result in a five day suspension. (Doc. 62, p. 54). Plaintiff was disciplined again after a March 14, 2011 incident that Defendants again considered "Substandard Work." (Id. at 56). As this occurrence involved the same category for disciplinary purposes, Defendants imposed a four day suspension and warned Plaintiff that the next incident of this sort would result in additional days off work, re-assignment, demotion, or termination. (Id.).

Plaintiff next was disciplined in May 2011 for dishonesty after being less than forthcoming about hitting another work truck. (Id. at 59). He received a written warning and five days off without pay. (Id.) Defendants demoted Plaintiff from Senior Lineman to Lineman and advised Plaintiff that any future issues involving dishonesty would result in immediate termination. (Id.). In July 2011, Plaintiff had another incidence of "Carelessness," resulting in only a written warning with no threat of future action. (Id. at 64). Plaintiff was tardy on September 14, 2011. (Id. at 67). Defendants placed a written warning in Plaintiff's

personnel file and indicated that the next instance of tardiness would result in three days suspension or termination. (Id.).

In October 2011, Defendants disciplined Plaintiff again after Plaintiff failed to secure a neutral line. (Id. at 68). Defendants suspended Plaintiff for four days without pay and instructed Plaintiff that "[t]he next incident of sub-standard work, conduct, safety, disobedience, or carelessness will result in immediate termination." (Id.). Plaintiff had no further issues until May 2012, when he received his first warning for failing to respond timely to a service call. (Id. at 76). Consistent with Loftis' explanation for how the progressive discipline policy operates, Plaintiff was not immediately terminated for this infraction because the late response fell into a different category for discipline than the prior incident. Rather, Defendants again suspended Plaintiff for three days. (Id.). Management thereafter held a "last chance" meeting with Plaintiff and reviewed his entire disciplinary record. (Id. at 78). Management explained to Plaintiff that he had reached the end of all disciplinary measures and that any future incident of any variety would result in immediate termination. (Id.). Accordingly, on June 30, 2012, when Plaintiff again failed to respond timely to another call, Defendants were acting within the scope of the company's policy by terminating Plaintiff. (Id. at 81).

22

Plaintiff has failed to produce any evidence of a similarly situated Caucasian comparator who was disciplined more favorably. Without a proper comparator, Plaintiff cannot establish a prima facie case of discrimination, and Defendants are entitled to summary judgment.

### B.    Pretext

Even if Plaintiff could establish a prima facie case of discrimination, the Court still finds that Defendants are entitled to summary judgment because Plaintiff cannot show that Defendants' legitimate, nondiscriminatory reason for terminating him was merely a pretext for race discrimination. Defendants have carefully outlined Plaintiff's disciplinary history and explained that while Plaintiff worked for a number of years without any performance issues, during the last sixteen months of his employment, Plaintiff committed numerous serious infractions that ultimately led to his termination.

The employer has the burden of production, not persuasion to articulate a nondiscriminatory reason for termination, a burden that has been described as "exceedingly light." Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 769 (11th Cir. 2005). To establish that the employer's proffered reason is nothing more than a pretext for discrimination, a plaintiff "must demonstrate that the proffered reason was not the true reason for the employment decision. The plaintiff may succeed in this either directly by persuading the court that a discriminatory

reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." <u>Jackson v. Ala. State Tenure Comm'n</u>, 405 F.3d 1276, 1289 (11th Cir. 2005) (internal quotations and punctuation omitted). Evidence offered to establish the prima facie case may be offered again to establish pretext. <u>Wilson</u>, 376 F.3d at 1088.

A plaintiff may not recharacterize the employer's proffered nondiscriminatory reasons. <u>Chapman v. AI Transport</u>, 229 F.3d 1012, 1030 (11th Cir. 2000). "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." <u>Id</u>. Further, "federal courts do not sit as a super-personnel department that reexamines an entity's business decisions." <u>Elrod v. Sears, Roebuck & Co.</u>, 939 F.2d 1466, 1470 (11th Cir. 1991). The Eleventh Circuit has repeatedly held that an employer may terminate an employee for a good or bad reason without violating federal law. <u>See</u> <u>id</u>.; <u>see</u> <u>also</u> <u>Damon v. Fleming Supermarkets of Fla., Inc.</u>, 196 F.3d 1354, 1361 (11th Cir. 1999) ("We are not in the business of adjudging whether employment decisions are prudent or fair."); <u>Smith v. Papp Clinic, P.A.</u>, 808 F.2d 1449, 1452-53 (11th Cir. 1987) ("[I]f the employer fires an employee because it honestly believed the employee had violated a company policy, even if it was mistaken in such belief," the discharge does not violate

federal law.); Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1187 (11th Cir. 1984) ("The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason all, as long as its action is not for a discriminatory reason.").

Defendants have met their burden of providing a legitimate, nondiscriminatory reason for terminating Plaintiff. The burden now shifts to Plaintiff to show that Defendants' proffered explanation for Plaintiff's termination is but pretext for race discrimination. Plaintiff first calls into question Defendants' decision to hold Plaintiff accountable for the last instance of sub-standard conduct, failing to respond to a service call in an appropriate amount of time. Plaintiff claims that the subjective application of the Defendants' unwritten response time policy is proof of pretext. As the Court has already noted, there has been inconsistent testimony about the response time requirement and whether there is an expectation for an employee to respond within 15 or 30 minutes of receiving a call from dispatch. However, even applying the longer time frame to the benefit of Plaintiff does not absolve Plaintiff of his misconduct, as the evidence reflects that while Plaintiff immediately answered the first dispatcher's call, he ultimately took just shy of two hours to respond when a second dispatcher roused him from sleep.

Plaintiff further alleges in reference to this incident that Defendants failed to follow their own policy of calling the next employee on call if unable to reach the first. On this particular date, the dispatcher had no reason to call the second person in line. Even though Plaintiff purportedly informed the dispatcher that he was ill, he also stated that he still could make the call and led her to believe that he would head in that general direction. Plaintiff did not say that he was too sick to report to work; therefore, Defendants had a reasonable expectation that Plaintiff could complete his assignment timely and reacted as a reasonable employer by holding Plaintiff accountable for his greatly delayed response time.

Plaintiff next asserts that Defendants' proffered explanation is pretext for discrimination on the basis of Plaintiff's unequal treatment and subjugation to harsher penalties for his mistakes. Plaintiff claims that Defendants specifically targeted him for discipline and left him to shoulder the burden of others' mistakes. As thoroughly discussed above, however, Plaintiff has failed to produce any evidence beyond his own beliefs and impressions that Defendants disciplined him differently than any other employee.

Based on the ample evidence in the record, Plaintiff has failed to carry the burden of showing that Defendants' reason for terminating him was a pretext for discrimination. Plaintiff has pointed to no direct evidence of outward discrimination by Defendants and can draw no appropriate comparisons to other

employees Plaintiff thinks were treated less harshly to create an inference of intentional discrimination. Defendants thus are entitled to judgment as a matter of law.

### C.    Hostile Work Environment

Plaintiff claims that he was subject to a constant barrage of verbal abuse and unfair disciplinary procedures that created a hostile work environment and impeded his ability to perform his job efficiently. The Court finds no validity to Plaintiff's claim.

Title VII is violated "when the workplace is permeated with racially discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Jones v. UPS Ground Freight, 683 F.3d 1283, 1292 (11th Cir. 2012) (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 (2002)) (internal punctuation omitted). The same is true under § 1981. See Edwards v. Prime, Inc., 602 F.3d 1276, 1300 (11th Cir. 2010); see also Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002); Shields v. Fort James Corp., 305 F.3d 1280, 1282, n.2 (11th Cir. 2002). An employer therefore is liable to an employee for  a racially hostile work environment where the employee proves that "(1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment was based on his

membership in the protected group; (4) it was severe or pervasive enough to alter the terms and conditions of employment and create a hostile or abusive working environment; and (5) the employer is responsible for that environment under a theory of either vicarious or direct liability." Id.

The court will consider "the frequency and severity of the conduct, whether it is physically threatening or humiliating, and to what degree it reasonably interferes with the plaintiff's job performance." Rojas v. Florida, 282 F.3d 1339, 1344 (11th Cir. 2002). However, "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" does not sufficiently impact the conditions of employment to trigger the applicability of Title VII. Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986) (quoting Rogers v. EEOC, 454 F.2d 234, 238 (5th Cir. 1971)). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview." Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 (1993). Racial slurs must "be so 'commonplace, overt and denigrating that they create[ ] an atmosphere charged with racial hostility.'" Edwards v. Wallace Cmty. Coll., 49 F.3d 1517, 1521 (11th Cir. 1995) (quoting E.E.O.C. v. Beverage Canners, Inc., 897 F.2d 1067, 1068 (11th Cir. 1990)). Discourteousness and rudeness do not equate to racial harassment, nor does a lack of racial sensitivity alone amount to actionable

28

harassment. Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998) (internal quotations and citations omitted).

Without dispute, Plaintiff as an African-American is a member of a protected group who was subjected to unwanted harassment and commentary on the basis of his race. However, the evidence does not warrant a finding that the off-color commentary and inappropriate jokes of Plaintiff's co-workers were so severe and pervasive to alter the conditions of Plaintiff's employment. The most offensive conduct described by Plaintiff is that of Monty Cowart, who regularly referred to Plaintiff as "colored" or "colored boy." Plaintiff did report Cowart's conduct to management and, while Plaintiff perceived that Defendants took no action against Cowart because management never informed Plaintiff of any remedial measures, the evidence shows that Defendants no longer scheduled Plaintiff to work under Cowart and eventually stripped Cowart of his supervisory position. These events transpired during 2006 and 2007, five or six years before Plaintiff's termination and seven years before Plaintiff initiated this lawsuit.

Plaintiff complains a great deal about being addressed as "you" or "hey you" and being called "butterfingers." But he admits that, while he felt these comments were meant derogatorily, the statements themselves are not racially charged. The majority of the other statements and behaviors highlighted by

Plaintiff in support of his hostile work environment claim while certainly inappropriate and insensitive were unreported, isolated comments of co-workers, not supervisors, uttered over an undefined period of time, and do not rise to an actionable level. The Court consequently grants Defendants' motion for summary judgment on Plaintiff's hostile work environment claim.

### D.    Intentional Infliction of Emotional Distress

Plaintiff's final claim is for intentional inflection of emotional distress. He alleges that years of humiliation, embarrassment, and malicious targeting of disparate disciplinary measures culminating in Plaintiff's termination, amount to intentional and reckless conduct on the part of Defendants. Plaintiff's claim lacks merit and is unsupported by any facts.

To recover on an intentional infliction of emotional distress claim, a plaintiff must show that "(1) defendants' conduct was intentional or reckless; (2) defendants' conduct was extreme and outrageous; (3) a causal connection existed between the wrongful conduct and the emotional distress; and (4) the emotional harm was severe. Abdul-Malik v. AirTran Airways, Inc., 297 Ga. App. 852, 856 (2009).

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice, or a degree of aggravation which would entitle the plaintiff to punitive damages for

> another tort. Liability has been found only where the conduct
> has been extreme and outrageous.

Kirkland v. Earth Fare, Inc., 289 Ga. App. 819, 822 (2008).

Georgia is an at-will employment state, and Georgia law does not recognize wrongful discharge of at-will employees. Beck v. Interstate Brands Corp., 953 F.2d 1275, 1276 (11th Cir. 1992); see also Phillips v. Pacific & S. Co., 215 Ga. App. 513, 515 (1994) (discharge for whatever reason, "without more, gives rise to no claim for the intentional infliction of emotional distress"). "Even if the employee is not terminable at will, discharge for an improper reason does not constitute the egregious kind of conduct on which a claim of intentional infliction of emotional distress can be based." Id.

Plaintiff has produced no evidence that Defendants' actions were intentionally discriminatory or in any way extreme or outrageous. Viewing the available facts in a light most favorable to Plaintiff, no reasonable person could conclude otherwise. Defendants' motion for summary judgment on Plaintiff's claim for intentional infliction of emotional distress is accordingly granted.

**IV.   Conclusion**

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. 54) is granted, and this case is dismissed with prejudice.

**SO ORDERED**, this the 31st day of March, 2015.

*s/ Hugh Lawson*
**HUGH LAWSON, SENIOR JUDGE**

aks